UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABEL HANSON,<br><br>       Petitioner,<br><br>   v.<br><br>M. McDONALD, Warden.<br><br>       Defendants. | Case No.: 1:11-cv-00414 – JLT (HC)<br><br>ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS<br><br>ORDER DIRECTING CLERK OF THE COURT TO ENTER JUDGMENT AND CLOSE FILE<br><br>ORDER DECLINING TO ISSUE CERTIFICATE OF APPEALABILITY<br><br>(Doc. 1) |

Petitioner Abel Hanson is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The parties previously consented to proceed before the jurisdiction of the Magistrate Judge. (Docs. 4, 10). For the reasons set forth below, the Court **ORDERS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice.

I. **PROCEDURAL HISTORY**

Petitioner is in custody of the California Department of Corrections and Rehabilitation and currently incarcerated at the California Corrections Institute located in Tehachapi, California. (Doc. 14). Petitioner is serving a 16-year sentence, pursuant to a judgment of the Superior Court of California, County of Tulare (the "Superior Court"). (Doc. 11 at 2, 3). On April 24, 2009, a jury convicted Petitioner of the following: (1) assault on Manuel Mendoza and Marisa Guillen by means of

force likely to produce great bodily injury (Cal. Pen. Code § 245(a)(1))(Counts One and Two); and (2) active participation in a criminal gang (Cal. Pen. Code § 186.22(a)(Count Three). (Doc. 11 at 3).  In addition, the jury found a gang enhancement applicable to Counts One and Two to be true, and also found that Petitioner had committed the assaults for the benefit of, in association with, or at the direction of a criminal street gang (Cal. Pen. Code § 186.22(b)(1)). Id.  Finally, during a bifurcated trial proceeding, the Court determined that Petitioner served a prior prison term, which was also considered a special allegation. Id.

Petitioner was convicted on the charges noted above and sentenced to the following: (1) for Count One, three years, plus 10 years for the gang enhancement, plus three years for the great bodily injury enhancement; and (2) for Counts Two and Three, concurrent sentences. Id.  The trial court stayed an additional one year enhancement (Cal. Pen. Code § 667.5(b)). Petitioner thus received a total prison term of 16 years. Id.

Petitioner subsequently filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA"), which, in an unpublished decision issued on July 13, 2010, affirmed Petitioner's conviction.[1]  Petitioner then filed a petition for review in the California Supreme Court on August 24, 2010.  The California Supreme Court denied the petition for review on May 9, 2011.

Petitioner filed the instant petition on March 10, 2011. (Doc. 1).  On May 14, 2011, Respondent submitted an Answer.  (Doc. 11).  Petitioner replied with his Traverse on June 9, 2011. (Doc. 13).

## II. FACTUAL BACKGROUND

The Court adopts the Statement of Facts as contained in the 5th DCA's unpublished decision:

"Sisters Angela Mendoza, Janie Diaz and Amanda Cabanyog each had a child baptized on the morning of September 13, 2008. One child was Marcus, the son of Angela Mendoza and Manuel Mendoza. Another was Michael or "Motito," the son of Janie Diaz and Mike Diaz. The third was Anthony, the son of Jose "Joe" Hanson and Amanda Cabanyog. In the afternoon the families had a party at a park in Porterville. The party at the park started at about 3:00 p.m. and went on all day and into the evening. There was food, a DJ playing music, and, as one witness described it, "everybody was drinking." At the end of the party at the park, people were invited to

---

[1] People v. Hanson, Case Number F057548, 2010 WL 2746384 (Cal. Ct. App. July 13, 2010).

continue partying at the home of the three sisters' parents, the Cabanyogs. People began arriving at the home sometime after 10:00 p.m.

Jose "Joe" Hanson came to the Cabanyog home and brought his brother Abel Hanson and some friends. Joe was a member of the Varrio Central Poros or VCP street gang, a Norteno gang. "Poros" is a slang term for Porterville. Joe had the word "Central" tattooed on his back and a tattoo saying "fuck those who oppose" on one of his shoulders. Joe was also known as "Buck" or "Little Joe." Joe's brother Abel Hanson was a member of the same gang. Among his tattoos were the letters "VCP" on his fingers, the word "ene" (a Spanish designation for the letter N) on one arm, and the phrase "[c]an't stop, won't stop." His moniker or nickname was "Bullet," and he had the words "Gangster Bullet" tattooed on one arm, and a tattoo of a large bullet on one calf. Detective Marcial Morales, the prosecution's gang expert, explained at trial that these tattoos were gang-related. He testified that the phrase "fuck those who oppose," for example, is "a common term used in the writings of the northern structure, the Norteno cause." Other VCP gang members who came to the Cabanyog home that night included Michael Gutierrez ("Duck"), Juvencio Godinez ("Hoover") and Jose Ruiz ("Boni").

The assaults took place in front of the Cabanyog home, located on the 1400 block of West Forest Avenue in Porterville. Marisa Guillen was either the wife or girlfriend of the Cabanyogs' son Jesus Cabanyog. Marisa lived either in that house or in a house nearby, but referred to the Cabanyog home as "our house." At the time of trial in this matter, almost every non-law enforcement witness who testified claimed not to remember much or not to have seen much about the incident. These included Marisa Guillen. The day after the incident, however, investigating Officer Wayne Martin interviewed Marisa at the Porterville Police Department in a room equipped with an audio recording system. The interview was recorded without Marisa's knowledge, and this recording was played for the jury at the trial. In it she described the incident as follows.

When Joe's friends showed up (apparently at the park party earlier in the day) "[o]ur family was like, you know, we were kind of like okay, we don't want to start problems so we let them stay." When Joe's friends later came to the house, someone asked Jose Ruiz ("Boni") to leave. It is not clear who made this request or why, but Marisa knew Boni because Boni used to date her husband or boyfriend Jesus Cabanyog's little sister. (Other testimony made clear that this younger sister was Myra, not one of the three sisters who had children baptized that day.) Abel Hanson, who Marisa described as "the instigator," then said to Jose Ruiz (Boni): "'You're going to let him talk to you like that. You better sock him.'" Boni then either hit or tried to hit the person who had asked him to leave. Abel Hanson and another one of Joe's "friends" then "jumped in" and one man was getting beaten up by three. Marisa herself then "had to jump in because, you know, I'm not going to let, you know, somebody get beat up." Marisa herself was then struck. It was Abel who was hitting her. When she was asked "Where did he hit you?" she stated that Abel hit her "everywhere" but not in the face and that he "scratched me here and then I have these bruises here." Marisa did not see any weapons. Abel Hanson was using his hands and was "punching me." After Marisa (Manuel Mendoza's sister-in-law) was struck, Manuel Mendoza "came and he started hitting them, and then all these

3

other guys came out of nowhere." The site of this incident was of course the home of Manuel Mendoza's in-laws. Other testimony described what Mendoza was doing as "trying to break up a fight." Marisa said that "four ... guys were beating up on Manuel" while the rest of Joe's friends were fighting "two guys" (apparently the man who had initially asked Boni to leave, and another man who had come to assist him). One of the four guys who beat up Manuel Mendoza was Abel Hanson, who Marisa saw "punching Manuel in the head." She also saw Boni punching Manuel. Manuel fell, and he "was on the ground so then they just started kicking him and stuff."

Marisa asked the attackers why they were doing this, and one of them responded "That's my homeboy, we have to." In the recorded interview Marisa further says: "He's all, 'We have to.' I go, 'Why?' I go, 'You guys just need to leave.' And he's like, 'I don't care. I have to.'" Marisa told Abel Hanson "You need to leave" and Abel responded "F-you." Abel "came after me again." Abel's girlfriend Valerie Barajas "tried to pull him away and said "Let's go." Abel Hanson responded "Nah" and then "[l]ike a psycho, he just came at me again, and that's when everyone started fighting again because he was coming after me, so the guys were trying to get him off again...." A questioning officer in the recorded interview saw what he described as looking like "burn marks" on an unspecified portion of Marisa's body. Marisa said "I think it's from the road probably" and said that at some point during Abel's attack on her Abel was dragging her by her hair.

When an officer arrived at the house, "they all just started running." Marisa estimated that "there was about eight-I guess eight of them and a girl" (Barajas). The guys "were all wearing white shirts." She said the "eight of them" had been fighting "three guys" but did not name any of the three except Manuel Mendoza. The eight guys and the girl all got into a gray truck and left. In the recorded interview Marisa also said that she was afraid and "didn't want them to come back because, you know, we have two kids and...." She said she "was afraid they were just going to try to come back with guns or-you know, just something because they were-they didn't have anything." She said "I can't testify against these guys." She was asked why, and she answered "Because they will know I did it." She was asked "Are you afraid of that?" and she answered "Yeah."

The recorded interview of Marisa Guillen was not the first time Officer Wayne Martin had spoken to her. It was the third time. He first spoke to her when he arrived at the Cabanyog home just after the incident had taken place. She told him then that Abel Hanson had been involved in the incident. Then he spoke to her again at the Porterville Police Department only about an hour after the incident. At the Police Department Marisa first told Martin that she didn't really care to be involved, but "then she stated that it was Joe and his brother Abel." At trial, Martin was asked: "And did she tell you what they were doing in regards to Manuel?" Martin's answer was: "Well, to quote her, she said, 'They were beating the fucking shit out of him.'" She also told him that Abel had assaulted her too. When Martin asked her why she had not told him this during their first contact, Marisa "told me that she was afraid and didn't care to be involved."

Manuel Mendoza was taken to a hospital after the attack. He suffered injuries to his shoulder, arm, leg, face and chest. After the attack his whole chest, left arm and left leg

turned "black." Two months later he underwent surgery to repair what he described as a "hole" in his left armpit or pectoral area. He was a plasterer and a foreman, but due to his injuries he was disabled and did not work at all between the time of the attack and the time of trial. At the time of trial Mendoza still could not lift his left arm higher than the level of his heart.

Detective Chris Contreras also investigated the incident. He spoke to Mendoza on September 18, 2008, and Mendoza identified four of his assailants as Abel Hanson, Joe Hanson, and two others who went by the nicknames "Hoover" and "Duck." Mendoza said there were at least five assailants. He described a fifth assailant but did not know the name or nickname of the fifth one.

At the scene on September 13 Officer Martin also spoke to a seventh-grade son of Janie Diaz. Martin testified that the boy told Martin two of the subjects involved were "Joe" and "Joe's brother." The boy "said that Joe's brother was the main person hitting Mr. Mendoza." On or about September 16 Detective Contreras spoke to Janie Diaz. Contreras testified that Diaz told him "her son wasn't gonna turn her [*sic*] back on her- on his Uncle Joe because he is family."

None of the three defendants called any defense witnesses at the trial except for Jose Ruiz, who testified in his own defense. He denied that he was a gang member, but was impeached with an inmate classification questionnaire he had signed. On it he responded to the question "Do you associate with prison gangs?" with the answer "North," and responded to the question "Do you have any known enemies?" with the answer "South." He claimed that he had been struck first during the incident on September 13, and also said that he never saw Abel Hanson or Joe Hanson there."

People v. Hanson, F057548, 2010 WL 2746384, at **1-4 (Cal. Ct. App. July 13, 2010) (unpublished).

## **DISCUSSION**

### I. **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d). Accordingly, the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v. Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by, Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant proceedings were initiated by the filing of the original petition on March 10, 2011, which is well after the enactment of the AEDPA, and thus this case is governed by the AEDPA.

**II. Legal Standard of Review**

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he can show that the state court's adjudication of his claim:

> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams v. Taylor, 529 U.S. at 412-413.

The first prong of federal habeas review involves the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and mixed questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."  Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. at 405.  A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner."  Brown v. Payton, 544 U.S. at 141; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).  In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 1388 (2011), the U.S. Supreme Court explained that an

"unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Richter, 131 S.Ct. at 786.  As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction.  Richter, 562 U.S. ___, 131 S.Ct. at ___(slip op. at 12-13)(quoting Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring).  The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. ___, 131 S.Ct. at ___(slip op. at 13).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."  Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A

state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires considerable deference be given to a state court's factual findings. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340. Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo. Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S.

648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

### III.     Review of Petitioner's Claims.

The instant petition raises the following claims: (1) Petitioner's Fourteenth Amendment due process rights were violated because the substantive gang offense (Count Three) was unsupported by sufficient evidence; and (2) the gang enhancements contained in Counts One and Two were unsupported by sufficient evidence.[2] (Doc. 1).

**A. Sufficiency of the Evidence for Count Three.**

1. The 5th DCA's Opinion

Petitioner first contends his substantive gang conviction (Count Three) violated his Fourteenth Amendment Due Process rights because it was unsupported by the sufficiency of the evidence. (Doc. 1 at 4).  This contention is without merit.

The 5th DCA rejected Petitioner's claim regarding Count Three as follows:

"Section 186.22, subdivision (a) states in relevant part:

> "(a) Any person who actively participates in any criminal street gang with knowledge that its members engage in or have engaged in a pattern of criminal gang activity, and who willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang, shall be punished by imprisonment in a county jail for a period not to exceed one year, or by imprisonment in the state prison for 16 months, or two or three years."

---

[2] Plaintiff avers that "[t]he trial court committed prejudicial error in admitting evidence of gang membership, thus impos[ing] an illegal gang enhancement." (Doc. 1 at 4).  However, in his Traverse (Doc. 13), Plaintiff clarifies the issue by stating, "Petitioner was wrongfully convicted as the available evidence was insufficient to convict him of active participation in a criminal street gang and denied petitioner his due process right to proof beyond a reasonable doubt." (Doc. 13 at 6).  Thus, the Court analyzes Petitioner's second issue under the law of sufficiency of the evidence.

Similarly, for the first time, Plaintiff alleges that the introduction of gang tatoos in a "non-gang" case violated his Sixth Amendment right to a fair trial.  However, Plaintiff failed to raise a Sixth Amendment issue before the state Court and thus the claim is unexhausted.  Accordingly, the Court will limit its analysis to the question of the sufficiency of the evidence.

Appellant contends there is no substantial evidence that his participation in the CVP gang was active, and no substantial evidence that he willfully promoted, furthered, or assisted in any felonious criminal conduct by members of the VCP gang. Applying the substantial evidence rule (see part "I" above),[3] we find these claims to be without merit.

In *People v. Castaneda* (2000) 23 Cal.4th 743, the court held "we construe the statutory language 'actively participates in any criminal street gang' (§ 186.22(a)) as meaning involvement with a criminal street gang that is more than nominal or passive." (*People v. Castaneda, supra,* 23 Cal.4th at p. 747.) The *Castaneda* court explained that "actively participates" does not require any showing that the defendant devotes all or a substantial part of his time and efforts to the criminal street gang. (*Ibid.*) There was nothing nominal or passive about appellant's involvement in the assaults by VCP members on Manuel Mendoza and Marisa Guillen. In *Castaneda* the court stated: "[T]hrough evidence of the crimes defendant here committed, his many contacts on previous occasions with the Goldenwest criminal street gang, and his admissions by bragging to police officers on those occasions of gang association or membership, the prosecution presented sufficient proof that the defendant 'actively participate[d]" in a criminal street gang within the meaning of section 186.22(a)." (*Id.* at p. 753.)

In the present case, the evidence was similar. Detective Morales testified his opinion that Abel Hanson was an active gang member was "based on prior contacts with him when he was younger, gang tattoos, self-admission, ID'd in photographs, that kinda thing." The jury saw a photograph of Abel Hanson flashing a gang sign. The photo was seized from Abel Hanson's home on the day after the assaults. The jury also heard evidence that appellant told Jose Ruiz "You better sock him," thus suggesting that at the time of the commission of the assaults Abel Hanson held a position of higher status in the gang than did Jose Ruiz. This was "sufficient proof" of active participation. (*People v. Castenada, supra,* 23 Cal.4th at p. 753.)

The assault by appellant and his two codefendants on Manuel Mendoza satisfied the "willfully promotes, furthers, or assists in any felonious criminal conduct by members of that gang" requirement of section 186.22, subdivision (a). (*People v. Ngoun* (2001) 88 Cal.App.4th 432.)"

---

[3] In Section I of its opinion, the 5th DCA sets forth the California substantial evidence rule used to analyze Plaintiff's sufficiency claim as follows:

"When a criminal conviction is challenged as lacking evidentiary support, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence-that is, evidence which is reasonable, credible, and of solid value-such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.' [Citations]" (*People v. Hillery* (1965) 62 Cal.2d 692, 702.) "[I]t is the *jury,* not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139.)"

People v. Hanson, F057548, 2010 WL 2746384 (Cal. Ct. App. July 13, 2010) (citations and quotations omitted).

People v. Hanson, F057548, 2010 WL 2746384 (Cal. Ct. App. July 13, 2010) (citations and quotations in originals).

### 2. Analysis.

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt.'" See id., (quoting Jackson, 443 U.S. at 319). Only where no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. See Jackson, 443 U.S. at 324; Payne, 982 F.2d at 338.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, Jackson does not permit a federal court to revisit credibility determinations. See id. at 957-958.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995). However, mere suspicion and

speculation cannot support logical inferences. Id.; *see, e.g.*, Juan H. v. Allen, 408 F.3d 1262, 1278-1279 (9th Cir. 2005) (only speculation supported conviction for first degree murder under theory of aiding and abetting).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H., 408 F.3d at 1274. Generally, a federal habeas court must ask whether the operative state court decision reflected an unreasonable application of Jackson and Winship to the facts of the case. Id. at 1275.[1]

Moreover, in applying the AEDPA's deferential standard of review, this Court must also presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459, 106 S.Ct. 2616 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597, 102 S.Ct. 1198 (1981).

Recently, in Cavazos, v. Smith, __U.S. __, 132 S.Ct. 2 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. ——, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

---

[1] Prior to Juan H., the Ninth Circuit had expressly left open the question of whether 28 U.S.C. § 2254(d) requires an additional degree of deference to a state court's resolution of sufficiency of the evidence claims. See Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004); Garcia v. Carey, 395 F.3d 1099, 1102 (9th Cir. 2005).

1 Cavazos, 132 S.Ct. at 3.

2 Here, the state court expressly cited circumstantial evidence of Petitioner's gang membership. Hanson, 2010 WL, at 7. Specifically, the state court considered that Detective Morales believed that Petitioner was an active gang member due to gang tattoos, Petitioner's self-admission, and prior contact with Petitioner, and that the jury viewed a seized photograph from Petitioner's house in which Petitioner flashed a gang sign. Id. In addition, the state court noted that Jose Ruiz testified that Petitioner directed Ruiz to "sock" the victim, which suggested that Petitioner held a higher position in the gang than Ruiz at the time of the altercation. Id. Most importantly, it was noted that this command was given during the commission of a felony. Id.

In any event, the evidence considered by the state court constitutes far more than a mere suspicion or speculation. It is of sufficient quantity and quality that a rational trier of fact could have found the elements of Cal. Pen. Code § 186.22(a) beyond a reasonable doubt. Jackson, 443 U.S. at 319. The federal Constitution requires no more. Accordingly, the state court's adjudication of this issue was neither contrary to nor an unreasonable application of clearly established federal law.

**B.  Sufficiency of the Evidence for Gang Enhancement**

Next, Petitioner argues that the gang enhancement contained in Counts One and Two were unsupported by sufficient evidence. This argument is also without merit.

1. 5th DCA's Opinion.

The 5th DCA analyzed and rejected Petitioner's contention that his gang enhancements were unsupported by the evidence as follows:

> "The substantial evidence standard of review applies to section 186.22 gang enhancements." (*People v. Augborne* (2002) 104 Cal.App.4th 362, 371.) (See part "I" above.) Section 186.22, subdivision (b)(1) provides for an enhanced penalty for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The language "for the benefit of, at the direction of, or in association with any criminal street gang" is sometimes called the "first prong" section 186.22, subdivision (b)(1), and the language " 'with the specific intent to promote, further, or assist in any criminal conduct by gang members ....' " is sometimes called the "second prong." (*People v. Villalobos* (2006) 145 Cal.App.4th 310, 322.)
>
> Appellant argues that the evidence was insufficient to support a finding that the section 245, subdivision (a)(1) assaults on Manuel Mendoza (count 1) and Marisa Guillen (count 2) were committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any

criminal conduct by gang members" (§ 186.22, subd. (b)(1)) because, in the words of appellant's brief, "there was insufficient evidence that appellant's specific intent was to benefit the VCP gang, as opposed to whatever personal objective he may have had."

The argument fails. The statute does not require a specific intent to benefit the gang. It requires "the 'specific intent to promote, further, or assist in any criminal conduct by gang members ....'" (§ 186.22, subd. (b)(1).) "[S]pecific intent to benefit the gang is not required." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198.) "As to the second prong of the enhancement, all that is required is a specific intent 'to promote, further, or assist in any criminal conduct by gang members.' (§ 186.22, subd. (b)(1).) Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist gang members in the commission of the crime. [Citation.]" (*People v. Villalobos, supra,* 145 Cal.App.4th at p. 322.) "There is no requirement in section 186.22, subdivision (b), that the defendant's intent to enable or promote criminal endeavors by gang members must relate to criminal activity apart from the offense the defendant commits. To the contrary, the specific intent required by the statute is 'to promote, further, or assist in *any* criminal conduct by gang members.' (Pen.Code, § 186.22, subd. (b), italics added.) ... [¶] ... [T]here is no requirement in section 186.22 that the crime be committed with the intent to enable or further any other crime...." (*People v.. Hill* (2006) 142 Cal.App.4th 770, 774.)

Nothing in the cases cited by appellant holds otherwise, except for the federal case of *Garcia v. Carey* (9th Cir.2005) 395 F.3d 1099, which construed the words "in any criminal conduct by gang members" to mean "in any other criminal conduct by gang members." Garcia has been rejected by California courts as ignoring the plain language of the statute. (*People v. Hill, supra,* 142 Cal.App.4th 770; *People v. Romero* (2006) 140 Cal.App.4th 15, 19; *People v. Vazquez* (2009) 178 Cal.App.4th 37, 353-354.) Abel Hanson, Jose "Joe" Hanson and Jose Ruiz were all convicted of the assault on Manuel Mendoza (count 1) and of the assault on Marisa Guillen (count 2). All were members of the same gang. Reasonable jurors could certainly conclude that each of these defendants had the specific intent to assist the others in the commission of these crimes. Nothing more was required."

Hanson, 2010 WL at **6-7 (citations and quotations in original).

  2.  Analysis.

Petitioner argues that, rather than furthering gang activity, Petitioner was merely defending Ruiz's honor during a personal family conflict when he suggested Ruiz should "sock" the victim. (Doc. 1 at 13). Similarly, he argues his gang enhancement was unsupported by the evidence because there was "no direct knowledge by the victims that Petitioner is even a gang member." Id at 14. While the record may present conflicting inferences, the Court must presume that the jury, as the trier of fact, resolved such conflicts in favor of the prosecution. Jackson, 443 U.S. at 326.

Notably, the state court considered that Cal. Pen. Code § 186.22(b)(1) provided for an enhanced penalty on a felony conviction for assisting a gang member in committing a felony. The state court rejected Petitioner's argument that the evidence at trial was insufficient to establish that

Petitioner intended to benefit the VCP gang. Rather, the state court distinguished Petitioner's argument, and correctly noted that the statute only required that a defendant intend to assist gang members in the commission of a felony. The state court noted that Petitioner, his brother, and Jose Ruiz were all convicted of same felony perpetrated on the same victims. As all were deemed members of the same gang, a reasonable juror could conclude that they intended to assist each other.

Any rational trier of fact could have found the essential elements of the Cal. Pen. Code § 186.22(b)(1) present beyond a reasonable doubt in this matter. Payne, 982 F.2d at 338. While Petitioner argues with the circumstantial evidence considered, such evidence is sufficient to sustain his gang enhancement. Walters, 45 F.3d at 1358. Thus, the state court's decision to apply the gang enhancements to Counts One and Two of his criminal conviction are supported by the sufficiency of the evidence.

### C. Certificate of Appealability.

The Court declines to issue a certificate of appealability. A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller–El v. Cockrell, 537 U.S. 322, 335–336, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

(a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c) (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A) the final order in a **habeas** corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

When a court denies a petitioner's petition, it may issue a certificate of appealability only when a petitioner makes a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To make a substantial showing, the petitioner must establish that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further'." Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (*quoting* Barefoot v. Estelle, 463 U.S. 880, 893, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983)).

In the present case, Petitioner fails to make the requisite substantial showing of the denial of a constitutional right to justify the issuance of a certificate of appealability. Reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Thus, the Court DECLINES to issue a certificate of appealability.

**ORDER**

For the foregoing reasons, the Court HEREBY ORDERS as follows:

1. The petition for writ of habeas corpus (Doc. 1) is **DENIED** with prejudice;
2. The Clerk of the Court is **DIRECTED** to enter judgment and close the file;
3. The Court **DECLINES** to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:   **July 3, 2013**                         /s/ Jennifer L. Thurston
                                                 UNITED STATES MAGISTRATE JUDGE